# Third District Court of Appeal

## State of Florida

Opinion filed December 16, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D14-1817 & 3D14-2863
Lower Tribunal No. 11-34830

_____

**Marriott International, Inc.,**
Appellant,

vs.

**American Bridge Bahamas, Ltd.,**
Appellee.

Appeals from the Circuit Court for Miami-Dade County, Marc Schumacher, Judge.

Holland & Knight LLP, and Rodolfo Sorondo, Jr. and Christopher N. Bellows; Jenner & Block LLP, and David A. Handzo (Washington, DC), Matthew S. Hellman (Washington, DC), and Zachary C. Schauf (Washington, DC), for appellant.

Heller Waldman, PL, and Glen H. Waldman and Eleanor T. Barnett, for appellee.

Before ROTHENBERG, LAGOA, and SCALES, JJ.

ROTHENBERG, J.

Marriott International, Inc. ("Marriott") appeals a final judgment, entered after a jury verdict, awarding American Bridge Bahamas, Ltd. ("American Bridge") damages by holding Marriott liable for: (1) a judgment that was originally obtained in the Bahamas against Ritz Carlton Rose Island Hotel Company, Ltd. ("RCRI"); (2) fraudulent inducement; and (3) conspiracy to commit fraudulent misrepresentation. For the following reasons, we reverse.

## BACKGROUND

In November 2005, Marriott formed RCRI under Bahamian law to construct and own a luxury resort on Rose Island in the Bahamas. RCRI purchased land on Rose Island and entered into a Heads of Agreement with the Bahamian government, representing that the resort could ultimately bring in hundreds of millions of dollars; in turn, the Bahamian government waived duties and taxes on construction materials and expedited the permitting process.

In October, 2006, GenLB Rose Island, Ltd. ("GenLB"), which was owned by Lehman Brothers Holdings, Inc. ("Lehman") and Gencom, acquired a 75% interest in RCRI, with a Marriott subsidiary retaining the remaining 25% of RCRI.[1] RCRI's initial financing for the project called for a budget of $120 million, with $80 million coming from Lehman via a loan to RCRI, and with $40 million

---

[1] There were several closely associated entities in the trial below, including Gencom Group, LLC and Gencom Asset Management Co., LP. As relevant to this appeal, unless otherwise specified, we will refer to all related Gencom affiliates as simply "Gencom."

coming from shareholder investments. During this initial construction phase, RCRI entered into a contract with American Bridge to build a marina for the resort.

In July 2008, when RCRI was unable to secure enough funding to pay American Bridge's invoice, RCRI's shareholders agreed between themselves to loan RCRI $31 million over an eleven-month period. RCRI used these installment loans to pay its past-due invoices up until September 2008. However, the infamous Lehman bankruptcy undercut Lehman's ability to fund the project, and accordingly, it made it impossible for GenLB, which was mostly owned by Lehman, to comply with the $31 million shareholder loan agreement. RCRI shareholders then stopped contributing to the shareholder loan agreement, and in October, 2008, RCRI notified American Bridge to stop construction. American Bridge was left with unpaid invoices, and RCRI's shareholders lost the money they had contributed.

American Bridge sued RCRI in the Bahamas for breach of contract in May 2010, and obtained a default judgment against RCRI in the amount of $7,585,482.63, plus interest. American Bridge then filed an action in Miami-Dade circuit court in October 2010 to enforce the Bahamian judgment against Marriott, Gencom, and their subsidiaries. The eighth and final amended complaint alleged liability, as it relates to Marriott, based on piercing the corporate veil of RCRI, as well as through a joint venture theory that labeled RCRI as the agent of a joint

3

venture between Marriott, Gencom, and Ritz Carlton; it also sought relief against Marriott for the alleged torts of fraudulent inducement and conspiracy to fraudulently induce.

The litigation continued for years, culminating in a multiple-week jury trial and a subsequent judgment on May 13, 2014. As relevant to this appeal, the jury found that the Bahamian judgment could not be enforced against Marriott through American Bridge's piercing the corporate veil theory of recovery; however, it did find that there was a joint venture between Marriott and Gencom, and that RCRI was the agent of that joint venture. Accordingly, the jury found Marriott liable for the Bahamian judgment against RCRI. The jury also found that Marriott fraudulently induced American Bridge to enter into the contract with RCRI by misrepresenting the availability of funding for the project at the outset. The jury awarded punitive damages against Marriott in connection with the fraudulent inducement. Lastly, the jury found that Marriott conspired with the other joint adventurers to fraudulently mislead American Bridge as to the availability of funding in 2008, after the contract between American Bridge and RCRI had been formed. The trial court subsequently found that the conspiracy judgment was duplicative of the enforcement of the Bahamian judgment, and stated that it would not enforce those damages unless the joint venture theory was rejected on appeal.

Marriott moved for a judgment notwithstanding the verdict and for a new trial, and the trial court rejected Marriott's arguments. Marriott appeals both the final judgment and the taxable costs assessed against Marriott as the losing party. For the following reasons, we reverse on all issues.

## ANALYSIS

We address the following three aspects of the final judgment. The first is whether Marriott can be held liable in an enforcement action for the judgment rendered against RCRI in the Bahamas on a joint venture/agency theory of liability, where the jury specifically found that American Bridge presented insufficient evidence to pierce the corporate veil. We need not decide that issue because American Bridge failed to present any evidence on at least one of the essential elements necessary to create a joint venture. The second concerns the judgment entered in favor of American Bridge on its fraudulent inducement claim. Judgment as to that claim must similarly be reversed because American Bridge failed to introduce any evidence of either a duty to disclose or a fraudulent statement made by Marriott. The third aspect relates to the judgment entered in favor of American Bridge as to its claim that Marriott conspired with others to fraudulently misrepresent the availability of the necessary funds to pay American Bridge for its work after the formation of the contract. We are equally compelled

5

to reverse on that aspect of the judgment because that claim was never pled in the operative complaint, and thus as a matter of law, it cannot be maintained.

We review a trial court's denial of a motion for directed verdict and for judgment notwithstanding the verdict de novo. Miami-Dade Cnty. v. Eghbal, 54 So. 3d 525, 526 (Fla. 3d DCA 2011). Appellate courts are required to evaluate the evidence in the light most favorable to the non-moving party, and abstain from reweighing any conflicting or ambiguous evidence presented below. Id. "But this general precept of deference to the finder of fact is limited by the rules of evidence, and this court need not defer to factual findings that are not based on competent evidence." A & A Elec. Servs., Inc. v. Jurado, 40 Fla. L. Weekly D1963, D1965 (Fla. 2d DCA Aug. 26, 2015).

## I.   The Enforceability of the Bahamian Judgment

The theory presented by American Bridge to the jury was that Marriott, Gencom, and Ritz Carlton, were all members of a joint venture, and this joint venture had as its agent RCRI. Thus, American Bridge contended that when RCRI breached its contract with American Bridge, Marriott was liable as a joint adventurer.

A joint venture is "an association of persons or legal entities to carry out a single business enterprise for profit." Fla. Tomato Packers, Inc. v. Wilson, 296 So. 2d 536, 539 (Fla. 3d DCA 1974). In addition to proving the existence of a contract,

6

the plaintiff must prove the following five elements as part of the contract, whether express or implied, for a joint venture to exist: "(1) a community of interest in the performance of the common purpose; (2) joint control or right of control; (3) a joint proprietary interest in the subject matter; (4) a right to share in the profits; and (5) a duty to share in any losses which may be sustained." Id. at 539; see E & H Cruises, Ltd. v. Baker, 88 So. 3d 291, 295 (Fla. 3d DCA 2012). "The absence of one of the elements precludes a finding of a joint venture." Jackson-Shaw Co. v. Jacksonville Aviation Auth., 8 So. 3d 1076, 1089 (Fla. 2008).

In order to establish the joint control necessary to find the existence of a joint venture, it must be shown that each of the parties to the joint venture had "**the right and the authority . . . to bind the others with reference to the subject matter of the co-adventure.**" Kislak v. Kreedian, 95 So. 2d 510, 516 (Fla. 1957) (emphasis added). Our sister court in Deal Farms, Inc. v. Farm & Ranch Supply, Inc., 382 So. 2d 888, 891 (Fla. 1st DCA 1980), articulated the joint control that must exist between joint adventurers:

> A contract of joint adventure is in effect one of mutual agency, each adventurer acting as a principal in his own behalf and as agent for his co-adventurer. Each one of several joint adventurers has the power to bind the others in matters that are strictly within the scope of the joint enterprise.

See also 8B Fla. Jur 2d Business Relationships § 816 ("Where one party's actions do not bind the other, joint control does not exist for purposes of a joint venture.").[2]

7

In the instant case, American Bridge argued that there was evidence of shared or mutual control over the day-to-day operations of the project, and that such control is sufficient to satisfy the joint control element of a joint venture. American Bridge also appears to have taken the position that if there was joint control over RCRI, which was neither a part of nor the object of the joint venture, this was sufficient to satisfy the joint control requirement.

In support of these arguments, American Bridge cites to <u>Arango v. Reyka</u>, 507 So. 2d 1211, 1213 (Fla. 4th DCA 1987). However, nothing in <u>Arango</u> supports the proposition that mutual control over a corporation that is not part of the joint venture or the object of the joint venture is sufficient to satisfy the element of joint

---

[2] Although Marriott argued that forming a corporation precludes the finding of a joint venture relationship between that corporation's shareholders, we do not decide that issue here, although it appears that the formation of a corporate structure precludes the formation of a joint venture. Generally, as this Court said in <u>Florida Tomato Packers</u>, 296 So. 2d at 539, "[a] joint venture has been defined as a special combination of two or more persons, who, in some specific venture, seek a profit jointly **without the existence between them of any actual partnership, corporation, or other business entity**." (emphasis added). Because joint ventures follow the laws of partnerships, <u>Hayes v. H.J.S.B.B. Joint Venture</u>, 595 So. 2d 1000, 1002 (Fla. 4th DCA 1992), it is informative that section 620.8202(2) of the Florida Statutes states that "[a]n association formed under a statute, other than this act, a predecessor statute, or a comparable law of another jurisdiction is not a partnership under this act." Such a rule makes sense because the decision to incorporate is generally made due to the incorporators desire to shield themselves and their future investors from individual liability, and to permit the simultaneous existence of both a corporation and a joint venture would provide plaintiffs with an alternative method of holding such incorporators and shareholders liable without piercing the corporate veil. Nevertheless, because the elements of a joint venture were not satisfied, we need not resolve this broader question of law.

8

control, and <u>Arango</u> actually demonstrates why the mutual control element was not established in the instant case. In <u>Arango</u>, while each party provided different services for the benefit of the joint venture, each party could bind the other with regard to the venture. <u>Id.</u> In other words, although the control over the joint venture was divided, each adventurer had the authority to bind the other regarding the control each was authorized to exercise.

Here, none of the alleged joint venturers had the authority to legally bind the other adventurers within the scope of the alleged joint venture. There was no evidence presented below of either joint control over the project or that any of the alleged joint adventurers had the right to exercise control over each other or to make unilateral decisions which would bind the other adventurers.

Marriott's control over the project was limited to its role as a minority shareholder of RCRI. And while it is true that Gencom Rose and Gencom Asset Management were able to make decisions regarding the project, their powers/authority to do so were based on their contracts with RCRI, not Marriott or any of the alleged joint adventurers. Similar to RCRI's contract with American Bridge to build the marina, RCRI contracted with Gencom Rose to manage the construction and with Gencom Asset Management to manage the hotel upon its completion. Marriott's interest in the performance of any of these contracts was as a minority shareholder, and nothing more.

We are also unpersuaded by American Bridge's argument that because RCRI's shareholders sometimes referred to themselves as being part of a joint venture, these references proved the existence of a joint venture. While it is not clear from the record whether RCRI's shareholders intended to create a joint venture, it is irrelevant either way because the test is not only whether the shareholders intended to create a joint venture, but whether the evidence of that intention satisfied each of the elements necessary for a joint venture's creation. See Kislak, 95 So. 2d at 515 (stating that even in cases where a joint venture is supposedly implied from the intentions and conduct of the parties, it is still necessary to allege and prove every single element of a joint venture).

American Bridge argued at trial that Marriott was liable for RCRI's breach of contract with American Bridge because RCRI was an agent of the joint venture. However, because we hold that there is no joint venture, we do not need to consider whether RCRI may have been an agent of the joint venture.

For these reasons, the final judgment as to the enforcement claim must be reversed because it is predicated on the jury's finding as to the existence of a joint venture, and there can be no joint venture when there is no evidence of joint control.

## II.    The Fraudulent Inducement Claim

American Bridge argues that Marriott fraudulently induced it to enter into a contract with RCRI based on two theories: (1) Marriott is liable for the fraudulent statements contained in the "lender letter" that made assurances as to project's financing; and (2) Marriott is liable because it had "superior knowledge" of facts regarding the lack of funding available to pay American Bridge but "deliberately failed to disclose" them. Because the lender letter cannot be attributed to Marriott, and because Marriott had no duty to disclose any material facts to American Bridge, we find that both arguments fail, and therefore the judgment must be reversed.

American Bridge's first theory is predicated on Marriott's knowledge of the lender letter. RCRI attorneys drafted and provided the lender letter to American Bridge, and American Bridge sent the letter to Lehman for the purpose of ensuring that funds would be available to pay American Bridge. The lender letter was later included into RCRI's contract with American Bridge. However, the lender letter cannot be imputed to Marriott simply by virtue of Marriott's awareness of its existence. If Marriott did not make the allegedly false statements contained in the lender letter, then it cannot be held responsible for their veracity absent some form of vicarious liability. The only theory of vicarious liability that was successful at trial was the joint venture/agency relationship. Because, as stated above, the joint

11

venture theory fails, the vicarious liability for statements made by other joint adventurers cannot succeed.

American Bridge's second argument, that Marriott failed to disclose its knowledge of future funding, is also unavailing because American Bridge did not proffer any evidence in support of an affirmative duty requiring Marriott to disclose any knowledge it may have had regarding the sufficiency of the available funds to finance RCRI's contract with American Bridge. See TransPetrol, Ltd. v. Radulovic, 764 So. 2d 878, 879 (Fla. 4th DCA 2000) (stating that "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose"). American Bridge did not argue or introduce evidence at trial to support a finding that a fiduciary obligation, privity, or other type of relationship existed that would have created a duty by Marriott to disclose the funds RCRI had available to finance its contract with American Bridge.

While there are exceptions to the rule that nondisclosure without a prior duty to disclose is non-actionable, none apply here. A duty to disclose may arise where a party undertakes to disclose certain facts, such that the party must then disclose the entire truth known to him. Nicholson v. Kellin, 481 So. 2d 931, 936 (Fla. 5th DCA 1985). Such a claim, however, must be supported by some evidence of a statement that would trigger the further duty to disclose all known material facts.

12

See, e.g., ZC Ins. Co. v. Brooks, 847 So. 2d 547, 551 (Fla. 4th DCA 2003) (stating that "providing [plaintiff] with documents that define [insurance] coverage while failing to provide documents that set forth the exclusions to that coverage is tantamount to fraud by omission").

American Bridge did not present evidence of such a statement from Marriott at trial. Instead, it relied on the lender letter that RCRI prepared for American Bridge to send to Lehman and it attempted, through its joint venture theory, to attribute RCRI's statements contained in the lender letter to Marriott. However, as discussed above, RCRI's statements to American Bridge cannot be attributed to Marriott absent the existence of a joint venture, and because there was no joint venture, there was no evidence establishing a duty by Marriott to disclose the financial health of RCRI.

## III.    The Conspiracy to Commit Fraudulent Misrepresentation

The jury found in favor of American Bridge regarding its claim that Marriott conspired with Gencom and Lehman to fraudulently misrepresent the availability of adequate funding for the project post-contract and during American Bridge's performance of the contract. However, because American Bridge never pled a conspiracy for post-contract fraudulent misrepresentation, this claim should never have been presented to the jury. Based on Marriott's timely preserved objection, we reverse.

13

"The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." Blatt v. Green, Rose, Kahn & Piotrkowski, 456 So. 2d 949, 950 (Fla. 3d DCA 1984). The independent civil wrong on which the civil conspiracy is dependent must be alleged in the complaint. See id. at 951. If a particular wrong is not pled as the underlying basis for the conspiracy, then the complainant must be "precluded from recovery" on the basis of any conspiracy to commit that wrong. See Arky, Freed, Stearns, Watson, Greer, Weaver & Harris, P.A. v. Bowmar Instrument Corp., 537 So. 2d 561, 563 (Fla. 1988). Any party who proceeds to trial on an unpled cause of action objected to by the opposing party does so "at the clear risk of reversal." Id. The policy underlying this pleading requirement is well established, "that litigants at the outset of a suit must be compelled to state their pleadings with sufficient particularity for a defense to be prepared." Id.

American Bridge's eighth amended complaint includes a conspiracy count based on fraudulent inducement to **enter into the contract**. The jury found in **Marriott's** favor on that count. The jury, however, was also asked to consider an alternative unpled conspiracy theory—that Marriott conspired to fraudulently misrepresent the availability of finances in 2008, **after the contract was executed**. American Bridge does not contest that Marriott objected to the introduction of evidence pursuant to a legal theory not raised in the complaint.

14

Clearly, a claim of fraudulent inducement to enter into a contract differs from a claim of fraudulent misrepresentation as to the availability of funding during the performance of the contract. A conspiracy as to the former is not necessarily a conspiracy as to the latter. American Bridge's failure to plead a conspiracy on the basis of fraudulent misrepresentations post-contract formation is fatal, as a matter of law, to the judgment on conspiracy to commit post-contract fraud.

## CONCLUSION

In sum, the jury rejected American Bridge's attempt to pierce the corporate veil and because American Bridge failed to prove its joint venture theory of liability, the Bahamian judgment against RCRI cannot be enforced against Marriott on any theory dependent upon a joint venture. American Bridge similarly cannot prevail on its fraudulent inducement claim as it failed to present any evidence of fraudulent statements made by Marriott, or establish Marriott's duty to disclose RCRI's financial status. Finally, it was error to allow American Bridge to recover on an unpled conspiracy claim. Accordingly, we reverse on all counts, and the costs awarded by the trial court must also be reversed.

Reversed and remanded.

15

SCALES, J. concurring.

I concur with the result reached in the majority opinion, but write separately to focus on particular grounds for reversal which, in my view, are based upon Florida law fundamentals governing commercial transactions.

American Bridge's contract to construct the marina was with RCRI, a duly formed Bahamian corporation. For American Bridge to hold an RCRI shareholder, such as Marriott, liable for RCRI's breach of contract, American Bridge was required to pierce RCRI's corporate veil. Hilton Oil Transp. v. Oil Transp. Co., S.A., 659 So. 2d 1141, 1151-52 (Fla. 3d DCA 1995). The jury returned a verdict – supported by competent, substantial evidence – against American Bridge on that claim.

Regarding American Bridge's alternate claim – that RCRI was an agent of its shareholders' joint venture – in my view that claim should have been summarily rejected by the trial court. As a matter of law, a corporation is not a joint venture. (See footnote 2 of the majority opinion.)

As to American Bridge's fraudulent inducement claim, if American Bridge was induced to execute the contract based on certain financial assurances, those assurances should have been memorialized in the parties' contract. Iden v. Kasden,

609 So. 2d 54 (Fla. 3d DCA 1992). A party cannot raise a claim of fraudulent inducement when the parties' written contract deals with the subject matter of, or expressly contradicts, the alleged misrepresentation. TRG Night Hawk Ltd. v. Registry Dev. Corp., 17 So. 3d 782, 784 (Fla. 2d DCA 2009). The parties' written contract expressly identifies the party responsible for payment of American Bridge's invoices which, in my view, conclusively defeats American Bridge's fraudulent inducement claim.

Similarly, if American Bridge executed the contract based on an assumption that Marriott would guarantee RCRI's contractual payment obligations, then American Bridge should have negotiated for Marriott either to execute a written guaranty of those obligations or be made a party to the contract. Juliana, Inc. v. Salzman, 181 So. 2d 3, 4 (Fla. 3d DCA 1965) (holding that Florida's statute of frauds requires that an agreement by one party to pay the debt of another party be in writing). Not only does the contract not contain any such guaranty, the parties' written contract expressly, and without equivocation, refutes any such assurance or guaranty.